PETROPLUS, JUDGE:
The above captioned cases were consolidated and heard together on October 13, 1970. The material facts of the first case, Claim No. D-300, are found to be substantially as follows:
*203 Claimant, Cecil Smith, Jr., while legally committed and confined in Weston State Hospital, an Agency of the State of West Virginia under the supervision and control of the Respondent, Department of Mental Health of the State of West Virginia, was attacked and beaten by another inmate of Weston State Hospital in a brief fight on July 4,1967. The other inmate, Jack Biggs, who had been confined periodically in the Penitentiary at Moundsville for various offenses, including homicide, was transferred from time to time to the Mental Hospital at Weston for psychiatric evaluation, treatment and restraint. He had an erratic history of mental disturbances and delusions. On July 29, 1965, about two- years before the assault in question, a written psychiatric evaluation disclosed him to be a man of mental confusion, suffering from emotional and mental disturbances, anti-social reactions with delusions of all kinds. In his history, we find that he stabbed a Penitentiary Guard for interfering with his reading of the Bible, an attempt to commit suicide by jumping off the wall of a building and delusions of persecution. A later report dated August 22, 1966, found him in active psychosis, harboring feelings that outside people were against him, impaired judgment 'but physically in good condition. The latter report shows an improvement in his conduct. Further reports in the file indicate behavioral problems and anti-social conduct up to the time of the assault but no particular acts of violence during that time. The technical diagnosis of Biggs’ condition was “schizophrenic reaction, paranoid chronic undifferentiated type”. Biggs was discharged from the Hospital on August 11, 1967, and returned on April 13, 1970, after being re-arrested for breaking into and vandalizing a Church and his conduct thereafter has been very aggressive and hostile. We have gone into considerable detail on his; history as it has a bearing on whether the Respondent’s Agents1, Officers and Employees have failed to use reasonable care to safeguard the Claimant from harm by another inmate in the-Institution.
At the hearing, the evidence developed that the attack on. the Claimant was unprovoked and resulted in a serious compound fracture of the Claimant’s arm in the same place where-it had previously been fractured in a baseball game and secured in place with screws. An 80% impairment of the normal use of the arm has resulted from the re-fracture.
*204 Respondent is charged with negligence in supervising and safeguarding the Claimant while he was confined in Weston.
The second case, Claim No. D-301, has been filed against the Department of Public Institutions of the State of West Virginia and alleges that the Claimant did not receive proper medical care from the State for his injuries. The Claimant was x-rayed at Weston, given first aid. and transferred to Fairmont Emergency Hospital shortly after the attack where his injury was diagnosed as a re-fracture of the distal humerus of the right arm. Claimant remained there with his arm in a cast until September, 1967, at which time he was returned to Weston State Hospital. The fracture was reduced by manual manipulation and Claimant’s arm remained in a cast on a closed reduction until September, 1967, when the cast was removed, revealing excessive swelling in a crooked arm, and with much pain and suffering. The arm was disfigured and could not be used functionally. A further examination at Weston State Hospital disclosed that there was considerable overriding of the fragments at the fracture joint and that an open re-reduction would have to be performed on the arm through the medium of surgical incision. The bone had to be rebroken 'and reset to correct this condition and on September 23, 1967, Claimant was returned to Fairmont Emergency Hospital where Dr. Salazar performed an operation to bring the bones into alignment. Claimant’s arm was again placed in a cast until on or about December 1, 1967, and now appears to be in proper alignment. He has less than 20% of the normal use of his arm. The condition is not improving and another operation may be needed. The second claim is based on the failure of Respondent’s Agents and Employees to properly diagnose the fracture and the failure to use reasonable care in reducing the fracture, in accordance with the usual and ordinary standards of the medical profession. Damages in the 'amount of $10,500.00 are sought in each of the above cases.
At the hearing, by agreement of counsel, the National Bank of Commerce, Committee for Cecil Smith, Jr., Claimant, was substituted as the complaining party. Inasmuch as the Claimant was under a mental disability, the two-year Statute of Limitations has no application to the cause of action in each case.
*205 After careful consideration of the evidence and the duties and obligations of the Department of Mental Health to protect an ¡incompetent person in its care and custody from a violent ¡attack by other inmates in the Institution, it is the opinion of the Court that under the circumstances of this case there is no showing of negligence on the part of the Hospital. In a Mental Institution where many persons are confined under various kinds of insanity, it must toe necessarily assumed that deranged persons will deviate from normal conduct and will engage in irrational acts and fights. Biggs became incensed at Claimant for refusing to “hang it up” (meaning commit suicide) after Claimant had promised to do so. They had formerly been buddies for some months. This, of course, does not relieve the Institution from exercising ordinary and reasonable care to protect its inmates from the violent and unpredictable conduct of other disturbed persons. The medical history of Jack Biggs does reveal an incompetent person prone to violence, motivated towards suicide and with delusions of persecution. It appears to us that the Hospital was without notice of the imminent danger to the Claimant and should not be held liable for his mistreatment toy another patient unless the Hospital failed to protect the Claimant from an obvious and certain danger. We find no evidence in the Record that the administrative conduct of the Hospital was such as to expose the Claimant unnecessarily to injuries through failure to use reasonable care under the circumstances. Three to six guards were on duty in this area of the Hospital where maximum security was provided because of the toad histories of the inmates confined in this particular wing. A constant surveillance to restrain insane, delirious or disabled patients is physically and economically impossible. In the opinion of the Court, the Hospital should only toe held liable if the patient is unreasonably exposed to hazards other than those which would be considered ordinary and normal risks in any Mental Institution.
The Court is of the opinion to deny any award to the Claimant or impose any liability on ¡the Hospital for failure to exercise reasonable care in guarding the Claimant, its patient, from violence inflicted by others. To hold otherwise, would require the Hospital to place each mental patient in solitary seclusion to alleviate quarrels, assaults and attacks. A Hospital *206 must operate within the budget furnished by the Legislature and its personnel is necessarily limited for employment of doctors, nurses, guards and other employees. No Institution can be ¡an insurer of the safety of its occupants ¡and this is particularly true of an insane asylum maintained by .the State as a public institution. Certain physical hazards are inherent in the operation of a mental institution and cannot be controlled by the personnel or guards of the institution except by superhuman effort and constant observation of a patient’s movements.
On the damages claimed for inadequate medical care, we are of the ¡opinion that the Claimant has made a showing by a preponderance of the evidence that he did not receive competent and careful medical care from the State of West Virginia, and we find medical malpractice. We are of the opinion that the Department of Public Institutions is required by law to exercise reasonable care to protect the health and lives of those in its care and custody, human beings who are weak or unwary inmates, from careless, unskillful or negligent medical practitioners. It would appear from the evidence in this case that the ¡general standards of the medical profession were not followed under the circumstances related to the Court. The Claimant had a serious fracture of the humerus of his right arm with overriding bone fragments and a manual manipulation and closed reduction of the fracture without orthopedic advice was a deviation from the exercise of reasonable skill and care for the safety and well-being of the patient, particularly when the same bone had previously been fractured. The failure to properly diagnose and reduce the fracture by open surgery at the outset is not a failure to exercise the best judgment in a medical diagnosis, which would be a tolerable error of doubtful judgment. The arm of the Claimant’s was fixed in a crooked position in a cast so that it could not properly heal. It was disfigured ¡and painful when removed from the cast and could not be used. A subsequent examination at Weston State Hospital two months later revealed an improper setting of the broken bones in the arm and the necessity of placing the bones in proper alignment by breaking the arm and inserting pins. It definitely appears that the bones were not properly aligned in the first instance at the Fairmont Emergency Hospital. It is our finding that the Respondent’s *207 Agents and Employees were not only negligent in their original diagnosis and in the attempted closed reduction oí the fracture from July 4, 1967 to September 21, 1967, but that the full nature and extent of the fracture was not understood or treated 'by the usual and ordinary standards of the medical profession. No effort was made to determine whether a proper alignment of the bones was made by adequate use of X-ray photography or visual inspection. Had the Hospital’s personnel exercised the ordinary care required, there should have been a complete and satisfactory recovery from the fracture with a minimum residual disability. The loss of 80% of the normal use of the right arm in the absence of some explanation for the unsatisfactory result indicates that the requisite skill 'and care was not exercised, which ordinarily would be exercised by members of the medical profession. The skill of physicians and surgeons in populated communities is ordinarily of high standard. In applying this standard to the treatment received by the Claimant, we find negligence in the making of this examination and diagnosis.
The charitable immunity of public 'and private hospitals from tort liability, aside from the question of sovereign immunity, has been practically eliminated in our State by recent decided cases and we are of the opinion that the State had a legal as well as a moral responsibility to treat its patient with more medical skill in collecting all fa'ctual data essential to arriving at a judgment as to the proper course of treatment to minimize residual disability.
For the foregoing reasons, the Court is of the opinion to allow the Claimant the sum of $3,000.00 in damages to cover his medical treatment, pain and suffering and permanent impairment. We are not inclined to include loss of past or future earnings as 'an item of 'damage because of the erratic employment record of the Claimant prior to the injury.
Claim disallowed in Case No. D-300.
Claim allowed in the amount of $3,000.00 in case No. D-301.